IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| AETNA INC.,<br><br>                     Plaintiff,<br><br>v.<br><br>HEALTH DIAGNOSTIC LABORATORY, INC.<br>and BLUEWAVE HEALTHCARE<br>CONSULTANTS, INC.<br><br>                     Defendants. | No. _____ |

      Plaintiff Aetna Inc. ("Aetna") files this Complaint against Defendants Health Diagnostic Laboratory, Inc. ("HDL") and Bluewave Healthcare Consultants, Inc. ("Bluewave"). Aetna seeks to recover tens of millions in monetary damages and other appropriate relief arising from Defendants' fraudulent, illegal, and tortious conduct, which caused Aetna to pay at least twice as much as it should have for the services allegedly provided by HDL. In support thereof, Aetna alleges the following:

**I.    INTRODUCTION**

      1.    Over a course of years, Defendants implemented a fraudulent billing scheme that included paying illegal kickbacks to physicians, providing unlawful inducements to patients, and encouraging physicians to order unnecessary blood tests, resulting in fraudulent and inflated medical claims being submitted to Aetna for reimbursement. Illegal kickbacks and inducements were used by Defendants to induce physicians and patients to utilize HDL for blood sample testing, rather than to use less expensive but equally qualified laboratories. Illegal kickbacks and inducements were also used to cause unnecessary blood tests to be ordered from HDL.

      2.    Defendant HDL is a clinical laboratory that performs diagnostic tests on patients' blood samples sent to it by physicians around the country.

1

3. Defendant Bluewave is a company that is closely affiliated with Defendant HDL. Bluewave provided the sales and marketing services for HDL's laboratory services, to enable, support and promote the unlawful billing schemes described herein. Bluewave obtained many millions of dollars in "commissions", in the form of a large percentage of the ill-gotten revenue procured by HDL through its fraudulent billing practices.

4. Defendants' illegal practices were actively concealed from Aetna for years. Defendants' overbilling scheme caused Aetna and Aetna's self-funded plan sponsor customers to pay to HDL tens of millions of dollars in inflated and fraudulent claims. Defendants' illegal practices also interfered with and harmed Aetna's contractual relationships with medical care providers, and Aetna's business relationships with its members and customers.

## II. JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction over all of the claims at issue in this case pursuant to 28 U.S.C. § 1332(a), because the parties are of diverse citizenship and the matter in controversy exceeds the statutory requirement.

6. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Aetna resides in this District, harm to Aetna was directed at it in this District, and because a substantial part of the events or omissions giving rise to the claim occurred in this District.

7. This Court has personal jurisdiction over Defendants because they regularly conduct business within this District, market HDL's services in this District, employed an illegal scheme in this District, and otherwise engaged in the improper conduct at issue in this case within this District.

## III. THE PARTIES

8. Aetna is a Pennsylvania corporation with its principal place of business in Hartford, Connecticut. Aetna also has substantial business operations located in Blue Bell, Pennsylvania. Aetna, through its affiliated companies, provides health insurance and administrative services for self-funded medical benefits plans throughout the United States, including a substantial market presence in the greater Philadelphia area.

9. Defendant HDL, a clinical laboratory, is a Virginia corporation with its principal place of business located in Virginia. HDL performs laboratory analyses and tests on blood samples drawn from patients that are sent to HDL by physicians around the country, including physicians in Pennsylvania. HDL's revenues are derived primarily from companies like Aetna, and from reimbursement obtained from the federal Medicare program. HDL offers a variety of tests, but it markets itself as focusing on the detection of biomarkers for cardiovascular disease, diabetes, and other similar diseases.

10. HDL was founded by Ms. Tonya Mallory in 2008. Prior to starting HDL, Ms. Mallory was a senior lab-operations manager at Berkley Heartlab, Inc., which is another laboratory that performs diagnostic tests on blood samples. Ms. Mallory served as the President and CEO of HDL until September 2014, when she abruptly resigned. Ms. Mallory resigned shortly after it was publicly reported that there was a pending federal investigation into the legality of HDL's business practices.

11. Defendant Bluewave is an Alabama corporation with its principal place of business in Alabama. At all times material hereto, Defendant Bluewave employed, trained and supported a sales and marketing force that directly marketed HDL products and services to physicians across the country.

12.     Mr. Cal Dent and Mr. Brad Johnson founded Bluewave in January, 2010. Like Ms. Mallory, Mr. Dent and Mr. Johnson also once worked for Berkeley Heartlab, Inc. They resigned from that company to create Bluewave, shortly after HDL began operating. Until just recently, Bluewave worked closely with HDL in developing and/or promoting its illegal kickback scheme, and it used commissioned sales representatives to promote HDL's services and business practices. At all times material hereto, in addition to owning Bluewave, Mr. Dent and Mr. Johnson were also part owners of HDL.

## IV.     FACTUAL ALLEGATIONS

### A.     Background

13.     As set forth below, Defendants' scheme to fraudulently overbill Aetna through kickbacks and illegal inducements was predicated upon a purposeful effort to undermine and disrupt Aetna's contracted network of medical care providers and Aetna's relationships with its members and customers.

14.     In Pennsylvania, and throughout the United States, individuals typically obtain health benefits coverage through managed care companies such as Aetna. Aetna provides these benefits by offering insurance coverage to individuals, including through employer group plans. Aetna also provides such benefits by administering self-funded benefits plans, including those established and funded by private employers, nonprofit entities, and plans established and funded by governmental entities on the local, state and federal level.

15.     Aetna provides health care benefits to its members through a network of quality medical providers who have entered into contracts with Aetna to render medical care to members in exchange for fees paid at negotiated rates. Medical providers who enter into contracts with Aetna are commonly known as "participating" or "in-network" providers. For the most part,

Aetna's contracts require the participating providers to accept the negotiated in-network rates as payment in full for services provided to Aetna members.

16. By contracting with Aetna, a medical provider is benefitted by gaining access to large volumes of patients who are Aetna members. Aetna members prefer to utilize in-network facilities and providers not just because of the quality and broad scope of Aetna's network, but also because Aetna's contracts with providers minimize costs to members.

17. In that respect, the benefit of using Aetna's network of providers is that the Aetna member ordinarily has no financial obligation to the participating provider beyond a small, fixed copayment, or coinsurance amount. The participating provider, usually, is contractually prohibited from billing the subscriber for any other amounts (*i.e.*, balanced billing), except under limited circumstances.

18. If a participating medical provider needs to refer an Aetna member for other medical services or to other facilities in the course of treating that member, that participating provider is expected to, and contractually obligated to, refer the patient to other in-network medical providers or facilities, wherever possible. This is a key feature of Aetna's network of contracted medical providers. The use of in-network providers, wherever possible, helps control the cost of medical care, and thus also the costs of health care coverage to consumers and to self-funded health benefits plans.

19. Sometimes, an Aetna member might not choose to use a medical provider within Aetna's network, or an Aetna participating physician is unable to refer an Aetna member to another participating medical provider. For this reason, many Aetna members are afforded "out-of-network" benefits as part of their health benefits coverage.

20. When an Aetna member uses an out-of-network medical provider, however, the amount of the co-payment or coinsurance that the member is required to pay is far higher than if the member utilizes a participating provider. This is because the member is choosing a provider that does not have negotiated, contractual rates with Aetna. Structuring a benefit plan in this way ensures that Aetna members make decisions about their choice of providers in a way that helps control the costs of medical care and coverage. This is a key aspect of the structure of Aetna's health benefits coverage, and indeed of all managed care benefits plans.

21. In the course of providing care to an Aetna member, a physician may need to have a patient's blood tested, such as for indicators of heart disease, diabetes, and other potentially chronic illnesses. When physicians are in need of blood sample analysis for their patients, blood samples are usually sent to an independent laboratory for the appropriate diagnostic analysis. Aetna's contracted network of participating medical care providers therefore includes independently owned diagnostic laboratories, located across the country.

22. Like other participating providers, Aetna's in-network laboratories agree to perform diagnostic testing on blood samples at negotiated, in-network rates. As with other participating providers, when an Aetna member utilizes an in-network laboratory for testing, the member is generally responsible only for making, at most, a small, fixed payment for the tests conducted at the in-network laboratory.

23. Independent diagnostic laboratories derive their business from the patients who choose to use that laboratory to test blood samples, and the decisions by those patients are often based upon the recommendations made by the patients' treating physicians. An Aetna participating physician thus plays a critical role in ensuring that, if a blood sample needs to be

taken and analyzed, that the testing occur at a diagnostic laboratory that is also a participating provider with Aetna.

### B. Defendants' Fraudulent Business Model

#### 1. *Defendants Unlawfully Induce Physicians and Patients to Utilize HDL's Out of Network Services*

24. HDL is not a participating provider as to Aetna. Thus, it ordinarily would not be providing services to Aetna members on any regular basis, or billing Aetna for such services.

25. However, to secure a stream of referrals for blood tests that ordinarily would not be sent to HDL, HDL used Bluewave to directly contact numerous referring physicians throughout the nation, and offered to pay those physicians kickbacks if they referred blood samples to HDL for analysis. The kickbacks involved the payment of far more money than what HDL could legally pay to physicians to cover the cost of having the blood samples sent to it.

26. When a participating physician's office is treating an Aetna member and draws a blood specimen to be sent for testing, the participating physician will of course be paid the appropriate fee by Aetna for the medical care being provided in his/her office. As for the laboratory to whom the blood sample is to be sent for testing, that laboratory is allowed to reimburse the physician for the de minimis additional cost incurred by the physicians, for example, to send the blood sample to the laboratory.

27. Medicare allows laboratories to compensate a physician's office about $3.00 per specimen to cover such costs. Anything more, according to the Office of Inspector General of the United States Department of Health and Human Services, could constitute an illegal kickback to induce a referral of business.

28. Paying kickbacks to physicians is illegal because the practice tends to skew the objectivity of a physician in providing medical care to patients. Payment of kickbacks to

physicians in exchange for referral of business encourages over-utilization of medical services, and thus unnecessary increases in the costs of medical care. The kickback itself also unnecessarily increases the cost of the medical services provided.

29. In their kickback scheme, HDL and Bluewave nevertheless assured physicians that they would receive payment of a fee of at least $20 for each blood specimen sent to HDL. This is more than six (6) times the rate deemed permissible by Medicare. In the discovery phase of this case, Aetna will explore whether these kickback payments were structured in such a way that the amounts of the kickbacks were multiplied based on the manner in which Defendants recommended that the physicians order tests from HDL.

30. The kickbacks paid by HDL to referring physicians were in an amount that far exceeded the actual value of any uncompensated services involved in drawing blood samples, or sending the specimens to HDL for testing. Physician practices that were encouraged by Defendants to frequently order blood tests received significant additional income in this manner. Payments of these kickbacks to Aetna's participating providers were never disclosed to Aetna.

31. These kickbacks were designed and intended to, and did, induce physicians to send blood samples to HDL for testing, instead of to in-network laboratories. These kickbacks were also intended to, and did, have the effect of causing physicians to order more blood tests and more different types of blood tests than were actually necessary.

32. Bluewave was fully aware of the effect that was caused by these kickbacks. The Bluewave workforce directly marketed this kickback arrangement to physicians, to encourage a stream of referrals of blood tests to HDL, that would not ordinarily have been received.

33. At all times material hereto, Defendants knew or recklessly disregarded the fact that paying these kickbacks to physicians was an illegal business practice.

34. After receiving the blood samples of an Aetna member and performing tests on the specimens (often including unnecessary tests), HDL would send bills to Aetna, knowing that Aetna would have to pay HDL, a non-participating provider, based on a percentage of those billed charges. The payments ultimately made were always far higher than what an in-network laboratory would receive as a fee for the same services.

35. The payment of kickbacks to physicians was not the only form of illegal inducements used by Defendants to secure referrals. Ordinarily, if a blood specimen of an Aetna member was sent to an out-of-network laboratory, the Aetna member would be faced with having to pay very high co-payments or high coinsurance amounts, just as would occur if the member chose to use any out-of-network provider. When faced with the prospect of these out of pocket costs, Aetna members would usually choose not to use an out-of-network laboratory.

36. To overcome the impediment to referrals represented by higher patient copayments and coinsurance, and to induce Aetna members to allow HDL to conduct the blood tests, HDL implemented a practice of routinely waiving, entirely, the Aetna members' obligations to make those out of pocket payments. This was done solely to induce the referral of the business to HDL, instead of to an in-network laboratory.

37. In its direct marketing to physicians, and in communications directly to patients, Defendants emphasized this feature of the Defendants' scheme, to ensure that patient co-payments and coinsurance obligations would not impede referral of blood sample testing requests to HDL.

38. Indeed, Defendants assured patients directly that "HDL, Inc. will accept the amount your insurance company allows for each diagnostic" test as full payment and that "your 'out-of-pocket' cost is ZERO for initial and follow-up testing." Defendants even instructed

9

patients to ignore and disregard correspondence from insurance companies, such as Aetna, that informed patients of the amount they were required to pay if they utilized HDL and its services.

39. At all times material hereto, Defendants knew or recklessly disregarded the fact that waiving patient copayments and coinsurance to induce referral of business was an illegal business practice.

40. HDL, in submitting billed charges to Aetna for blood testing performed for Aetna members, never disclosed to Aetna that it had already agreed with the patient to discount the amount of the bill. The billed charges submitted to Aetna should have been reduced by the amount of the considerable co-payments and coinsurance amounts that had been waived, but the billed charges never accounted for those discounts. The inflated billed charges submitted by HDL thereby caused Aetna to pay more for HDL's services than Aetna would have otherwise paid had it known of the patient discounts.

41. HDL submits claims for reimbursement to Aetna on standard billing forms (such as HCFA 1500 forms published by the Centers for Medicare and Medicaid Services ("CMS")), and their electronic equivalent. In submitting such forms, HDL intended for Aetna to rely upon the accuracy of the information in the claims forms to process and pay claims to HDL.

42. These forms (including their electronic equivalents) required HDL to accurately set forth the information necessary to process its claim for reimbursement, including the services provided; the date of service; the provider's charge; and the provider's eligibility for payment. HDL was further required to certify that the forms do not contain any misrepresentation or any false or misleading information.

43. When submitting its reimbursement forms to Aetna, HDL was required to certify that the clinical laboratory was eligible to provide the services described in the claims; that it

10

performed the services billed; that the forms were completed with information and statements that were true, correct and complete in every respect; that the rendered services were medically indicated and necessary; and that the billed amounts were those actually incurred by the patient, accounting for any discounts provided.

44. The claims for reimbursement submitted by HDL to Aetna nevertheless contained false, fraudulent, and misleading information and/or omissions of material facts, upon which Aetna reasonably relied. Defendants failed to disclose to Aetna that physicians were being paid illegal kickbacks to send blood samples to HDL for analysis. Defendants failed to disclose that as a matter of policy HDL waived collection of co-pays, coinsurance and deductibles from patients, and that the actual charge for the services had already been discounted to levels well below the charge that HDL submitted to Aetna for reimbursement.

45. The funds fraudulently procured in this manner, by submission of fraudulent claims sent to Aetna, were not just Aetna's funds. Aetna administers self-funded employee health benefits plans on behalf of companies, non-profit corporations, and governmental entities. The scheme perpetrated by Defendants resulted in overbilling that defrauded not only Aetna and other managed care companies, but also self-funded employee benefits plans.

## COUNT I
## FRAUD
### (Aetna v. Defendants)

46. Aetna incorporates by reference all of the forgoing and subsequent paragraphs as if fully set forth herein.

47. Defendants submit and caused to be submitted to Aetna bills seeking reimbursement for laboratory tests conducted on blood samples collected from Aetna members.

48. As set forth above, the bills submitted by Defendants to Aetna contain intentional representations of material facts, and/or purposeful omissions of material facts which render the bills false and misleading.

49. The misrepresentations of material and/or purposeful omissions of material fact were made by Defendants to Aetna for the purpose of inducing Aetna to pay the bills submitted.

50. Aetna reasonably and justifiably relied upon Defendants' intentional misrepresentation of material facts and/or purposeful omissions of material facts in paying the claims submitted to it.

51. In reasonable and justifiable reliance on the fraudulent claims submitted by HDL, Aetna paid substantial sums to HDL. HDL, in turn, shared the proceeds of the fraudulent scheme with Bluewave in accordance with their plan.

52. As a direct, proximate and reasonably foreseeable result of Defendants' conduct, Aetna has suffered damages.

53. Defendants' actions and omissions were willful, wanton, intentional, malicious, outrageous, and warrant the imposition of punitive damages.

WHEREFORE, Aetna demands judgment in its favor and against Defendants jointly and severally, for damages in excess of $150,000 as well as punitive damages, costs of suit, and any other legal and equitable relief this Court deems appropriate.

### COUNT II
### TORTIOUS INTERFERENCE WITH BUSINESS AND CONTRACTUAL RELATIONS
(Aetna v. Defendants)

54. Aetna incorporates by reference all of the forgoing and subsequent paragraphs as if fully set forth herein.

55. As described above, Aetna's network of contracted providers and facilities is comprised of a series of contracts between Aetna and medical providers, including physicians, laboratories, and other medical facilities.

56. The practice of paying kickbacks, besides being illegal in and of itself, has the intended effect of undermining the very basis and purpose of Aetna's network of contracted medical care providers. The payment of kickbacks does and is intended to induce participating physicians not to utilize less costly in-network diagnostic laboratories, as required under the terms of provider agreements, and is intended to, and does, incentivize physicians to order more blood tests than are medically necessary, contrary to the terms of provider agreements.

57. The practice of waiving patient responsibility payments, besides being otherwise illegal in and of itself, interferes with Aetna's contractual and business relationships with its members. This practice purposely undermines the agreed-upon structure of health benefits afforded by Aetna to its members, causes business to be referred to HDL when it otherwise would not be, and has the effect of unnecessarily increasing the costs of medical care and medical benefits to Aetna members and customers.

58. At all times material hereto, Defendants knew and intended that their scheme to overbill Aetna would cause interference in Aetna's contractual and business relationships with its contracted network of providers and with its members and customers.

59. Defendants' misconduct is not privileged or justified, is intended to harm Aetna, is accomplished through wrongful and illegal means, and is willful, wanton, intentional, malicious and outrageous, justifying the imposition of punitive damages.

60. As a direct, proximate and reasonably foreseeable result of Defendants' conduct, Aetna has suffered damages.

WHEREFORE, Aetna demands judgment in its favor and against Defendants, jointly and severally, in an amount in excess of $150,000, as well as punitive damages, costs of suit, and any other legal or equitable relief this Court deems appropriate.

## COUNT III
## CIVIL CONSPIRACY
### (Aetna v. Defendants)

61. Aetna incorporates by reference all of the forgoing paragraphs as if fully set forth herein.

62. As set forth above, HDL and Bluewave combined for a common purpose to do unlawful acts, or to do lawful acts by unlawful means, or for an unlawful purpose.

63. Each of the Defendants committed overt acts in furtherance of the common purpose alleged.

64. As a direct, proximate and reasonably foreseeable result of Defendants' conspiracy, Aetna has suffered damages.

65. Defendants' misconduct is willful, wanton, intentional, malicious, and outrageous, warranting the imposition of punitive damages.

WHEREFORE, Aetna demands judgment in its favor and against HDL and Bluewave for damages in excess of $150,000, including punitive damages, costs of suit, and any other legal or equitable relief this Court deems appropriate.

## COUNT IV
## UNJUST ENRICHMENT
### (Aetna v. Defendants)

66. Aetna incorporates by reference all of the forgoing paragraphs as if fully set forth herein.

67. In the absence of a contractual agreement, the provider of medical services is only entitled to a reasonable fee for rendering medical care.

68. HDL charged and received from Aetna payments for services reasonable fee charged by other laboratory providers in the relevant community.

69. Defendants have retained the benefit of these unreasonable charges by retaining the monies paid by Aetna, in excess of what is reasonable in the relevant community.

70. Defendants' retention of these monies is thus unjust and inequitable. Defendants acquired these funds through illegal conduct, which has harmed Aetna, and it is therefore also unjust and inequitable for Defendants to retain these funds.

WHEREFORE, Aetna demands judgment in its favor and against Defendants for all its damages, which exceed $150,000, and any other relief this Court deems appropriate.

## JURY DEMAND

Aetna hereby respectfully demands a jury trial pursuant to the Seventh Amendment to the United States Constitution and Federal Rule of Civil Procedure 38(a).

Respectfully submitted,

*/s/ John M. Elliott*
John M. Elliott
Elliott Greenleaf & Siedzikowski, P.C.
925 Harvest Drive, Suite 300
Blue Bell, PA 19422
(215) 977-1000

Dated: April 10, 2015