**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| AETNA INC.,<br><br>                    Plaintiff,<br><br>v.<br><br>HEALTH DIAGNOSTIC LABORATORY, INC.,<br>BLUEWAVE HEALTHCARE CONSULTANTS,<br>INC., FLOYD CALHOUN DENT, III, ROBERT<br>BRADFORD JOHNSON, AND LATONYA<br>MALLORY,<br><br>                    Defendants. | No. 2:15-cv-1868-RK |

### ORDER

AND NOW, this _____ day of _____, 2016, upon consideration of Defendant Latonya Mallory's Motion to Dismiss Plaintiff Aetna Inc.'s Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(1), and Plaintiff's Opposition thereto, IT IS HEREBY ORDERED that Defendant's Motion is DENIED.

BY THE COURT:

_____
Robert F. Kelly, Jr., U.S.D.J.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

AETNA INC.,

                Plaintiff,

v.

HEALTH DIAGNOSTIC LABORATORY, INC.,
BLUEWAVE HEALTHCARE CONSULTANTS,
INC., FLOYD CALHOUN DENT, III, ROBERT
BRADFORD JOHNSON, AND LATONYA
MALLORY,

                Defendants.

No. 2:15-cv-1868-RK

## PLAINTIFF AETNA INC.'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT LATONYA MALLORY'S RULE 12(b)(1) MOTION TO DISMISS

Date:  September 15, 2016

John M. Elliott
James C. Crumlish, III
Mark J. Schwemler
John P. Elliott
Gregory S. Voshell
ELLIOTT GREENLEAF, P.C.
925 Harvest Drive, Suite 300
Blue Bell, PA 19422
215-977-1000

*Counsel for Plaintiff Aetna Inc.*

Plaintiff Aetna Inc. ("Aetna") respectfully submits this Memorandum of Law in response to Defendant Latonya Mallory's ("Defendant" or "Mallory") Fed. R. Civ. P. 12(b)(1) Motion to Dismiss based on a facial challenge to the Amended Complaint.  As set forth below, consistent with this Court's previous Memorandum Opinion and Order applying the *same legal standard*, (Dkt. Nos. 29-30), *Aetna, Inc. v. Health Diagnostic Lab., Inc.*, Civ. A. No. 15-1868, 2015 U.S. Dist. LEXIS 172003 (E.D. Pa. Dec. 28, 2015) (denying Defendants Bluewave Healthcare Consultant, Inc., Floyd Calhoun Dent, III, and Robert Bradford Johnson's Motion to Dismiss), the Court should deny Defendant's Motion in its entirety.

## I.   INTRODUCTION

This case involves a fraudulent scheme created and implemented by a diagnostic laboratory, Health Diagnostic Laboratory, Inc. ("HDL"), its CEO Mallory, and HDL's closely-related marketing arm, Bluewave Healthcare Consultants, Inc. ("Bluewave"), which is co-owned by Dent and Johnson (all collectively, "Defendants").[1]  Together, Defendants carefully orchestrated a massive fraud on Aetna, other commercial insurance companies, employers, patients, and federal taxpayers.  Defendants did so by developing and implementing illegal referral and billing practices throughout the country.  These practices unnecessarily inflated the cost of medical care to commercial payors and self-funded plan sponsors (including employers, governmental units, and public pension plans).

In particular, Defendants paid illegal kickbacks to physicians, encouraged unnecessary laboratory testing, provided unlawful inducements to patients, and fraudulently billed Aetna by, *inter alia*, failing to disclose material facts.  Defendants also tortiously interfered with contracts

---

[1] Bluewave, Dent and Johnson will be collectively referred to as the "Bluewave Defendants."

between Aetna and physicians within Aetna's network of contracted providers by inducing these physicians to breach their agreements with Aetna in exchange for large payoffs. It took several whistleblowers and robust federal investigations to undercover this scheme. (*See* Amended Complaint ("Am. Compl.") Ex. 1.) The investigations resulted in the federal government intervening in a pending *qui tam* action, prompted a settlement in excess of $45 million between the government and HDL, and left Defendants blaming each other for the damage their scheme had caused. The federal government's case against the Bluewave Defendants is still pending. (*See id.*)

Mallory seeks dismissal of Aetna's claims against her for fraud, tortious interference, unjust enrichment, and civil conspiracy, arguing only that Aetna lacks standing under Section 2, Article III of the United States Constitution, based on a facial challenge, because it did not sufficiently allege "'injury and causation.'" (Dkt. No. 38-2, Mallory's Memo. of Law at 4.) Stated otherwise, Mallory claims that Aetna has not alleged facts sufficient to confer subject-matter jurisdiction over Aetna's claims.

Mallory's arguments are not supported by Aetna's allegations or the applicable law. Given Aetna's allegations, the pending federal investigation and corresponding *qui tam* action, and the Court's December 28, 2015 Memorandum Opinion and Order, it is simply not credible for Mallory, the former CEO of HDL, to claim that Aetna did not sufficiently aver the Constitutional elements of standing. While Mallory utterly fails to even attempt to analyze Aetna's four causes of action, nevertheless, each claim properly sets forth Article III standing, and any claim to the contrary raised by Defendant is specious for the following reasons:

- **First**, economic harm is the classic type of injury that satisfies the Article III injury-in-fact inquiry. Mallory ignores the fact that Aetna clearly alleges that Defendants failed to disclose that they were paying kickbacks to Aetna's participating providers, and that the charges they submitted to Aetna had already

been discounted to the patients through the waiver of member payments.  As a result of Defendants' unlawful scheme, Aetna paid far more to HDL than it should have.  And Mallory, as the CEO of HDL and one of the masterminds of the fraudulent scheme, developed and implemented this scheme.

- **Second**, Aetna's injuries are fairly traceable to Mallory, a central player in orchestrating Aetna's injuries in the form of increased costs.  Aetna has sufficiently alleged that she created, supported, and participated in HDL's submission of false bills to Aetna, and that she is therefore liable for Defendants' fraudulent scheme.

- **Third**, the Amended Complaint seeks money damages and equitable relief from Defendants, including Mallory personally.  Accordingly, a favorable decision by the Court will redress the substantial injuries caused by Mallory and suffered by Aetna.

Ultimately, Mallory's Motion relies on misstatements of the Amended Complaint and misapprehension of the governing law.  Because Aetna has stated cognizable claims against her and satisfied the Article III standing requirements, Mallory's baseless Motion should be denied in its entirety.

## II.    FACTUAL BACKGROUND

### A.    Plaintiff Aetna.

Aetna enters into thousands of contracts with physicians and medical facilities across the country to form a network of medical care providers.  This network allows Aetna's members to access high quality and affordable medical services.  (Am. Compl. ¶¶ 24-25.)  Through these agreements, Aetna plays a critical role in controlling the rising costs of medical care for members and its customers.  (*Id.* ¶¶ 26, 28.)  When Aetna members treat with physicians or at facilities within Aetna's contracted network, including laboratories, the Aetna members are generally responsible for paying only a small portion of the medical costs.  (*Id.* ¶ 27.)

Providers benefit from insurance networks as well, because they have access to a larger volume of Aetna members on an in-network basis.  (*Id.*)  Aetna members overwhelmingly prefer

to treat with in-network providers because when an Aetna member uses an out-of-network medical provider, the amount of the co-insurance or deductible that the member is required to pay is far greater than if the member utilizes a participating provider.  (*Id.* ¶ 30.)  HDL is not a part of Aetna's network, and thus should not ordinarily be providing services to Aetna members on a regular basis, or billing Aetna for such services.  (*Id.* ¶ 34.)

      **B.**    **The Defendants.**

Defendant HDL is a clinical laboratory that, prior to its settlement with the DOJ and its subsequent bankruptcy, performed diagnostic tests on patients' blood samples.  (*Id.* ¶¶ 3, 11.)  These samples were sent to HDL by referring physicians around the country, including physicians in Pennsylvania.  (*Id.*)  Mallory was the President and CEO of HDL until approximately September 2014, when she abruptly resigned after it was publicly reported that there was a pending federal investigation into Defendants' business practices.  (*Id.* ¶ 13.)  Mallory, along with her co-conspirators Defendants Dent and Johnson, devised a scheme at HDL that involved paying kickbacks to physicians, offering unlawful inducements to patients and physicians, and encouraging physicians to order unnecessary panels of blood tests.  (*Id.* ¶ 18.)  While she operated HDL between 2008 and 2014, Mallory was paid many millions of dollars— over $26 million—in compensation and other benefits as a result of the illegal marketing and business practices engaged in by Defendants.  (*Id.* ¶ 14.)   Bluewave is an Alabama corporation that worked hand-in-hand with HDL, and which recruited, employed, trained, and supported a sales and marketing force that directly marketed HDL products and services to physicians across the country. (*Id.* ¶ 15.)

      **C.**    **Defendants' Unlawful Scheme Harms Aetna and Contributes to the Rising Costs of Medical Care.**

The federal government has published guidance on which types of efforts laboratories

can undertake to lawfully secure referrals, and which type of practices would constitute unlawful kickbacks. Medicare, for example, only allows laboratories to compensate a physician's office $3.00 per specimen; anything more constitutes an illegal kickback – *i.e.*, larger payments induce providers to refer samples to a certain laboratory. (*Id.* ¶ 39.) In this case, Mallory and her co-conspirators hatched the idea to ignore federal and state law so that they could secure a stream of referrals for blood tests that would not ordinarily be sent to HDL. Defendants directly contacted numerous referring physicians throughout the nation and told them that they would be paid an illegal kickback to refer blood samples to HDL. (*Id.* ¶¶ 35, 37.) Defendants assured physicians that they would receive payment of a fee of *at least* $20 for each blood specimen sent to HDL— more than six times the rate deemed permissible by Medicare and the Department of Justice. (*Id.* ¶ 41.) Bluewave entered into a contract with HDL executed by Mallory on behalf of HDL to market the unlawful kickback and billing scheme directly to providers. (*Id.* at Ex. B.) After entering into the contract with HDL, Defendants proceeded to explain their scheme to physicians across the country. (*Id.* ¶ 43; *see also id.* at Ex. B.) Indeed, Bluewave sales representatives emphasized the benefits of this source of revenue to physicians and physician groups. (*Id.* ¶ 44.)

Securing the physician referral is only part of Defendants' scheme. Defendants also needed to account for the fact that, as an out-of-network provider to Aetna, Aetna's members would be required to pay far more money for tests performed at HDL than they would if the sample was referred to an available, in-network laboratory. Defendants, through Mallory, therefore implemented a practice of routinely waiving Aetna members' entire payment in order to induce the referral of business to HDL, instead of to an in-network laboratory. (*Id.* ¶ 50.) Defendants went so far as to instruct Aetna members to ignore any correspondence from Aetna that informed patients of what they were required to pay if they used HDL's services. (*Id.* ¶ 52.)

5

When billing Aetna, HDL failed to disclose that Defendants were paying kickbacks to Aetna's participating providers.  (*Id.* ¶ 43.)  HDL also failed to disclose that the billed charges had already been discounted to the patient through the waiver of member payments.  (*Id.* ¶ 54.) As a result of Defendants' unlawful and fraudulent scheme, Aetna paid more to HDL than it should have.  (*Id.* ¶ 55.)  And, because Defendants were paid a percentage of what HDL received, Defendants directly benefited from their development and marketing of the unlawful scheme.  (*Id.* ¶¶ 20-21.)  Aetna believes that the Defendants improperly secured more than $200 million dollars in commissions between 2010 and 2014.  (*Id.*)  Likewise, Mallory, as CEO of HDL, benefitted by receiving excessive compensation in the multi-million dollar range between 2008 and 2014.  (*Id.* ¶ 14.)

> **D.     The Federal Government's Investigation Unraveled and Revealed Defendants' Scheme.**

A series of whistleblowers, identified in a recently unsealed *qui tam* complaint, *see* Am. Compl. Ex. A, brought Defendants' scheme to the attention of the federal government, which launched an investigation into HDL, Mallory, and Bluewave.  The federal government also intervened in the *qui tam* action.  *See id.*  In connection with its investigation, HDL settled with the DOJ for nearly $50 million.

When the federal government launched its investigation, the finger-pointing began between HDL, Mallory and Bluewave.  HDL blamed Bluewave.  Meanwhile, Bluewave blamed HDL and sued HDL for more than $200 million in the United States District Court for the Northern District of Alabama.  *See Bluewave Healthcare Consultants, Inc. v. Health Diagnostic Laboratory, Inc.*, No. 5:15-cv-00884-MHH (N.D. Ala. 2015); *see also Bluewave Healthcare Consultants, Inc. v. Health Diagnostic Laboratory, Inc.,* 5:15-cv-00030-HGD (N.D. Ala.). Meanwhile HDL sued Defendants Dent and Johnson in Virginia federal court for violating a

shareholder agreement, in a case that quickly and quietly settled.  *See Health Diagnostic Laboratory, Inc.*, 3:15-cv-00030-REP (E.D. Va. 2015).  HDL later filed for bankruptcy shortly after it announced a settlement with the DOJ.

      **E.**    **The Court Has Already Denied a Substantially Similar Motion Filed by the Bluewave Defendants, Holding that Aetna Sufficiently Pleaded its Causes of Action.**

On October 19, 2015, the Bluewave Defendants filed a Fed. R. Civ. P. 12(b)(6) Motion to Dismiss.  (Dkt. No. 23.)  Following the filing of Aetna's Memorandum of Law in Opposition to the Motion to Dismiss (Dkt. No. 26), and the Bluewave Defendants' Reply Brief (Dkt. No. 28), the Court denied the Motion in its entirety.  (Dkt. No. 29-30.)  Applying the same standard applicable to this pending Motion, the Court held, *inter alia*, that Aetna adequately pleaded each cause of action as to the Bluewave Defendants.  (*See id.*)  The Amended Complaint, of course, alleges, *inter alia*, that the illegal conduct engaged in by Defendants was "personally planned, authorized, directed and engaged in by Mallory when she was acting as the CEO" of HDL.  (Am. Compl. ¶ 2.)

## III.   <u>STANDARD OF REVIEW</u>

"The standard for reviewing dismissals under Rules 12(b)(1) (for lack of subject matter jurisdiction) and 12(b)(6) (for failure to state a claim) 'is the same: we accept as true plaintiffs' material allegations, and construe the complaint in the light most favorable to them.'"  *Baldwin v. Univ. of Pittsburgh Med. Ctr.*, 636 F.3d 69, 73-74 (3d Cir. 2011) (quoting *Alston v. Countrywide Fin. Corp.*, 585 F.3d 753, 758 (3d Cir. 2009)).  When reviewing a facial challenge, which contests the sufficiency of the pleadings, "the court must only consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff."  *Gould Elecs., Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000).  "[A]

complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).   Rather, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.*

The Federal Rules require that a complaint "contain factual allegations that, taken as a whole, render the plaintiff's entitlement to relief plausible." *TruePosition, Inc. v. LM Ericsson Tel. Co.*, 899 F. Supp. 2d 356, 359 (E.D. Pa. 2012) (Kelly, J.) (citing *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 98 (3d Cir. 2010)).   "This 'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element.'" *Id.* (quoting *W. Penn Allegheny Health Sys., Inc.*, 627 F.3d at 98).   In the end, "the court must 'determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief.'" *Rosiji v. City of Phila.*, Civ. A. No. 11-6469, 2012 U.S. Dist. LEXIS 65667, at *12 (E.D. Pa. May 9, 2012) (quoting *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 374 n.7 (3d Cir. 2002)).

Article III of the Constitution limits federal jurisdiction to the adjudication of "cases" or "controversies."   U.S. Const. art III, § 2.   Subsumed under the cases-or-controversies requirement are a number of justiciability doctrines, including the necessity that "a litigant ha[s] 'standing' to invoke the power of a federal court." *Allen v. Wright*, 468 U.S. 737, 750 (1984). Concerning Article III standing specifically, a plaintiff must demonstrate the "irreducible constitutional minimum of" the following three elements:

> First, the plaintiff must have suffered an injury in fact -- an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.   Second, there must be a causal connection between the injury and the conduct complained of -- the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.   Third, it must be likely, as opposed to merely

> speculative, that the injury will be redressed by a favorable decision.

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal quotations, alterations, and citations omitted). Significantly, "[a]t the pleading stage, *general factual allegations of injury resulting from the defendant's conduct* may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 279 (3d Cir. 2014) (emphasis added) (quoting *Lujan*, 504 U.S. at 561); *see also Enslin v. Coca-Cola Co.*, 136 F. Supp. 3d 654, 661 (E.D. Pa. 2015) (same).

## IV.   ARGUMENT

### A.   For Each of its Claims, Aetna Has More than Adequately Alleged Cognizable Injuries that are Traceable to Mallory's Unlawful Conduct, and which Are Likely to Be Redressed by a Favorable Decision.

Generally, "a plaintiff must demonstrate standing for each claim he seeks to press." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006). Nonetheless, where, as here, all of the claims challenge Defendants' fraudulent, illegal, and tortious conduct, "and [the claims] all allege precisely the same injuries to [plaintiff,] . . . a claim-by-claim discussion of [plaintiff's] constitutional standing is unnecessary." *Toll Bros., Inc. v. Twp. of Readington*, 555 F.3d 131, 138 n.5 (3d Cir. 2009) (reversing district court and holding that the plaintiffs satisfied all three Constitutional standing requirements). All of Aetna's injuries stem from Defendants' fraudulent, unlawful, and tortious conduct concerning the billing scheme which included kickbacks to physicians, encouraging physicians to order unnecessary blood tests, and providing illegal inducements to patients in the form of waived co-payments, co-insurance, and deductibles. Aetna clearly alleges that Defendants' scheme ultimately resulted in Defendants submitting fraudulent and inflated medical claims. Aetna further alleges that because of this scheme, Aetna

actually paid far more than it otherwise should have paid to Defendants, including Mallory. This is all that Aetna must assert to satisfy the standing requirements.

> **1.  Aetna Has Sufficiently Alleged that Mallory Directly Participated in and Enabled HDL's Submission of Fraudulent Bills to Aetna, Causing Aetna to Pay Far More Than It Should Have Paid, thereby Satisfying the Injury-in-Fact Requirement.**

Aetna has sufficiently alleged injury-in-fact. "Injury-in-fact is not Mount Everest." *Danvers Motor Co. v. Ford Motor Co.*, 432 F.3d 286, 294 (3d Cir. 2005) (Alito, J.) (reversing district court and finding plaintiffs adequately alleged standing). To satisfy this element, the plaintiff must suffer a palpable and distinct harm, "mean[ing] that the injury must affect the plaintiff in a personal and individual way." *Lujan*, 504 U.S. at 561 n.1. It is well settled that "*[t]here can be no doubt that . . . financial harm counts as injury-in-fact.*" *Danvers*, 432 F.3d at 292 (emphasis added). In *Danvers*, then Third Circuit Judge Alito aptly noted that "[m]onetary harm is a classic form of injury-in-fact." *Id.* at 293. The Third Circuit further observed that this is so "obvious" that "it is often assumed without discussion." *Id.* (citing *Videon Chevrolet, Inc. v. General Motors Corp.*, 992 F.2d 482, 483-84 & n.1 (3d Cir. 1993)).

Mallory complains that Aetna's allegations of harm are vague and conclusory, and rely on speculation about what referrals physicians "might" have made under Defendants' fraudulent scheme. (*See* Mallory's Mem. of Law at 3-4.) That is simply not so. The Amended Complaint is replete with allegations of cognizable harm suffered by Aetna, including the vast financial harm due to Mallory and Defendants' illegal scheme. Aetna contends that Defendants, including Mallory, were unjustly enriched and committed fraud, tortious interference, and civil conspiracy by, *inter alia*, submitting claims for payment that failed to disclose material facts and made affirmative misrepresentations of fact. In particular, Aetna alleges that Defendants' kickbacks caused physicians to send blood samples to HDL, instead of to laboratories that were in Aetna's

network, and those kickbacks caused physicians to order more tests than were actually necessary. (Am. Compl. ¶ 46.)  Defendants then would submit bills to Aetna, knowing that Aetna would pay Defendants based on a percentage of billed charges; and as a result, Aetna's payments "were always far higher" than what Aetna would have paid to an in-network provider.  (*Id.* ¶ 48.)  As to Defendants' illegal waivers of patient co-payments and co-insurance, Aetna alleges that at the express direction of Mallory, Defendants did not disclose that the bill had already been discounted to the member.  (*Id.* ¶ 54.)  These misrepresentations caused Aetna to pay "more to HDL than it should have, because the payments to HDL were made based on a percentage of the billed charge."  (*Id.* ¶ 55.)

The allegations in the Amended Complaint are more than sufficient to show that Defendants, including Mallory, caused Aetna a concrete economic harm by fraudulently causing Aetna to pay more to Defendants than it should have.  For instance, Aetna expressly alleges that:

> Defendants were at all times fully aware that the *payment of kickbacks and the monetary inducements* offered to patients had the *direct effect of causing* Aetna members to utilize HDL, *instead of less expensive* but equally qualified laboratories within Aetna's contracted network of medical providers.  According to some news reports, these business practices caused HDL's annual revenue to more than double in a single year, to a level of over $400 million during 2012.  When federal investigators later intervened, and interrupted Defendants' scheme, HDL's annual revenues plummeted.  This reflects the *direct effect these corrupt business practices had upon the volume of patient referrals*.

(*Id*. ¶ 62 (emphases added).)

Mallory also fails to acknowledge that numerous preceding paragraphs describe her specific actions to facilitate HDL's fraudulent scheme, her integral role in the conception and implementation of the fraudulent scheme, and the resultant economic harms.  (*E.g.*, *id.* ¶ 2 ("[T]he illegal conduct engaged in by HDL and Bluewave was personally planned, authorized,

directed and engaged in by **Mallory** when she was acting as the CEO . . . . The individual Defendants are believed to have derived tens of millions of dollars in profits from their illegal business practice."); *id.* ¶ 18 ("Effective January 2010, HDL and Bluewave entered into a 'Sales Agreement,' executed by **Mallory**, Dent and Johnson, a copy which is attached hereto as Exhibit 'B.'  Pursuant to this arrangement, Bluewave agreed to actively market and promote practices which involved paying kickbacks to physicians, offering unlawful inducements to patients and physicians, encouraging physicians to order unnecessary panels of blood tests, and other unlawful practices."); *id.* ¶ 51 ("In their direct marketing to physicians, and in communications directly to patients, Defendants, including at the express direction of and with the support of . . . **Mallory**, emphasized [the routine waiving of Aetna members' entire obligations], to ensure that patient co-payments and coinsurance obligations would not impede referral of blood sample testing requests to HDL."); *id.* ¶¶ 54, 59 (HDL submitted the fraudulent bills to Aetna "[a]t the express direction of and with the support of" Mallory.).

In sum, Aetna alleges that Mallory directly enabled, supported, promoted, and profited from HDL's unlawful billing scheme, by providing sales and marketing services to participating physicians, and that her involvement and participation in this fraudulent scheme was vital to its success.  All of these actions undertaken by Mallory were to the financial detriment of Aetna, who paid the fraudulent claims submitted by Mallory's company, HDL.[2]

---

[2] Mallory also seems to suggest that Aetna must allege facts to show that referrals of "individual patient[s]" caused Aetna to pay more than it should have to Defendants, and that "individual physician[s]" made these unlawful referrals.  (*See* Mallory's Mem. of Law at 4-5.) This Court has already rejected that argument, finding that Aetna's allegations arise under the same facts as the *qui tam* action, and "[t]o require anything more at this stage in the case would essentially turn this into discovery and place a tremendous and unlawful burden on Plaintiff." *Aetna, Inc.*, 2015 U.S. Dist. LEXIS 172003, at *11.

Consequently, Aetna paid more money to HDL than it otherwise would have, and Aetna seeks to recover these overpayments as damages in this case. *Maya v. Centex Corp.*, 658 F.3d 1060, 1069 (9th Cir. 2011) ("[P]laintiffs spent money that, absent defendants' actions, they would not have spent. . . . This is a quintessential injury-in-fact."); *United States ex rel. Wlochowski v. Merck & Co.*, 44 F. Supp. 3d 581, 602 (E.D. Pa. 2014) (plaintiffs adequately alleged injuries-in-fact because they asserted "that, as a result of [d]efendant's misrepresentations, they were fraudulently and deceptively induced to purchase [d]efendant's product and have therefore suffered an economic injury").

For these reasons, Mallory's fatally flawed Motion should be denied.

### 2. The Amended Complaint Contains an Abundance of Allegations that Show that Mallory Inflicted Harm upon Aetna, thus Satisfying the Traceability Prong for Standing.

The second requirement for Article III standing, traceability, "focuses on *who* inflicted that harm." *Toll Bros., Inc.*, 555 F.3d at 142 (emphasis in original). Here, Aetna must show that Mallory's "actions, and not the actions of some third party [not before the Court], caused the plaintiff's injury." *Id.* (citing *Lujan*, 504 U.S. at 560); *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976) ("[T]he 'case or controversy' limitation of Art. III still requires that a federal court act only to redress injury that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court."). The "causal connection need not be as close as the proximate causation needed to succeed on the merits of a tort claim[,]" but merely "an indirect causal relationship will suffice" as "long as there is a 'fairly traceable connection between the alleged injury in fact and the alleged conduct of the defendant[.]'" *Toll Bros., Inc.*, 555 F.3d at 142 (internal citations omitted) (quoting *Vt. Agency Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000)).

As evidenced *supra*,[3] "general factual allegations of injury resulting from [Mallory's] conduct" are apparent throughout the Amended Complaint.   *Enslin*, 136 F. Supp. 3d at 666. Aetna has alleged with specificity that Mallory was a central player in this illegal billing scheme: she helped to create and implement it. (*E.g.*, Am. Compl. ¶¶ 17-18, 50-52.)

For example, in addition to the facts already set forth above, the Amended Complaint alleges that:

- "Dent, Johnson, and **Mallory** used Bluewave to provide sales and marketing support to HDL, to enable, support and promote the unlawful billing and marketing scheme described herein." (Am. Compl. ¶ 5.)

- "Aetna believes that **Mallory** was paid many millions of dollars in compensation and other benefits as a result of the illegal marketing and business practice engaged in by all Defendants . . . **Mallory's** participation in this scheme caused her to be paid, just between 2008 and 2014, over $26,000,000 in salary, bonuses, and other compensation." (*Id.* ¶ 14.)

- "**Mallory** left [her former firm] Berkley to start the business of HDL . . . to assist HDL with perpetrating the schemes complained of herein." (*Id.* ¶ 17.)

- "**Mallory**, Johnson, and Dent, through Bluewave, agreed to develop a network of independent sales and marketing personnel who would promote HDL's improper business practices throughout the country." (*Id.* ¶ 19.)

In sum, Aetna alleges that Mallory directly enabled, supported, promoted, and profited from HDL's unlawful billing scheme, by providing sales and marketing services to participating physicians, and that her involvement and participation in this fraudulent scheme was crucial to its realization.   Had Aetna been aware of the fraudulent billing scheme and the misrepresentations contained on those bills, it would not have paid Defendants nearly as much as it did.  These allegations demonstrate that Mallory's misconduct resulted in injury to Aetna, that is, at a minimum, "fairly traceable" to Mallory, and more likely than not, *directly traceable* to

---

[3] In order to avoid repetition and preserve the Court's resources, Aetna incorporates by reference Section IV(A)(1) of this Memorandum as if it were set forth fully within this section.

Mallory, who "personally planned, authorized, directed and engaged in" "the illegal conduct" committed by HDL.  (*Id.* ¶ 2.)  *Accord United States ex rel. Wlochowski*, 44 F. Supp. 3d at 602 ("Here, [p]laintiffs allege that, but for the fraud and misrepresentations made by the [d]efendant, [p]laintiffs would not have purchased the vaccine.  As a result, the plaintiffs have met their burden with respect to causation."); *see also Maya*, 658 F.3d at 1070 (holding that traceability requirement satisfied where developers' allegedly fraudulent conduct "inflated" home prices, thereby "causing plaintiffs to overpay").

### 3. Aetna's Injuries Caused by Mallory Will Undoubtedly Be Redressed by a Favorable Decision.

Redressability is "closely related" to, and "often" overlaps with, traceability.  *Toll Bros., Inc.*, 555 F.3d at 143 (citation omitted).  As opposed to traceability, which "looks backwards . . ., redressability looks forward (will a favorable decision alleviate the harm?)."  *Id.* (citing *Lujan*, 504 U.S. at 560-61).  Thus, Aetna must show that "the injury will be redressed by a favorable decision."  *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000).  To achieve this, it is sufficient for Aetna to demonstrate a "substantial likelihood that the requested relief will remedy the alleged injury in fact."  *Stevens*, 529 U.S. at 771.

Here, Aetna seeks damages in excess of $150,000 jointly and severally from Defendants, as well as whatever other equitable and legal relief the Court deems appropriate, for the economic injuries it has suffered.  (Am. Compl. Wherefore Cl.)  Undoubtedly, Aetna's injuries will be redressed by a favorable decision.  *Wlochowski*, 44 F. Supp. 3d at 602 ("Plaintiffs seek compensatory damages for the vaccine, as well as any other damages permitted by the statutes they invoke.  Both, should they be awarded, are likely to provide redress for the Plaintiffs economic injuries.") (internal citation omitted).

Therefore, Aetna has satisfied the redressability prong.

**B.      The Cases Relied upon By Mallory Are Entirely Inapposite.**

Mallory disingenuously contends that *In re Schering-Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235 (3d Cir. 2012), and an unreported opinion that is not binding on this Court, *Plumbers & Pipefitters Local 572 Health & Welfare Fund v. Merck & Co.*, Nos. 12-1379 & 12-3652, 2013 U.S. Dist. LEXIS 61051 (D.N.J. Apr. 29, 2013), both of which are factually dissimilar, are purportedly "instructive."   Those cases are easily distinguishable, and when contrasted with Mallory's egregious misconduct, highlight how her misdeeds directly and concretely harmed Aetna and why, therefore, her Motion must be denied.

In *Schering-Plough*, the Third Circuit Court of Appeals ruled that the Third Party Payer ("TPP") Local 331 did not adequately show the required connection between its injury and defendant's conduct because, unlike here, the TPP attempted to exclusively rely on factual allegations concerning drugs *other than the ones for which it paid*.  *Schering-Plough*, 678 F.3d at 247 ("Local 331 defends its standing to sue in large part on the basis of drug purchases made by the other TPP Plaintiffs. . . . Such allegations are unhelpful to Local 331, which does not allege that it ever paid for a Temodar or Intron-A prescription.").  In contrast, here, Aetna alleges that it paid "tens of millions of dollars in inflated and fraudulent claims" based on Defendants' fraudulent bills which were, of course, actually paid by Aetna.  (Am. Compl. ¶ 6.)

In *Plumbers & Pipefitters Local 572*, 2013 U.S. Dist. LEXIS 61051, at *23-24, a district court in New Jersey found that the TTPs lacked standing because, unlike in this matter, they had not alleged that Merck, the defendant drug manufacturer, had made misrepresentations directly to the TTPs.  In this matter, however, and as robustly discussed in Section IV(A)(1) *supra*, the Amended Complaint sufficiently alleges how a much more complex and sinister scheme was created by Mallory and specifically directed to Aetna that included, amongst other things: (a)

paying illegal kickbacks to physicians and encouraging physicians to order unnecessary blood samples; (b) inducing patients to seek treatment at an out-of-network provider and incentivizing those patients to do so by waiving their co-pays, co-insurance, or deductibles; and (c) ultimately submitting fraudulent and inflated medical bills to Aetna for reimbursement.  (Am. Compl. ¶¶ 1-6, 14, 17-19, 23, 31-63.)   This sophisticated scheme "caused Aetna" "to pay HDL tens of millions of dollars in inflated and fraudulent claims."  (*Id.* ¶ 6.)  Any contention by Mallory that these averments are lacking (which have already withstood the Bluewave Defendants' Motion to Dismiss) is belied by a fair reading of the Amended Complaint.[4]

Furthermore, as set forth *supra*, Aetna has overwhelmingly set forth sufficient allegations to maintain Article III standing—indeed, far more than the "general factual allegations of an injury resulting from [Mallory's] conduct" deemed adequate by the Supreme Court.  *Lujan*, 504 U.S. at 561.

### C.      In the Alternative, Aetna Should Be Granted Leave to Amend.

In the event that the Court finds that Aetna has not alleged sufficient facts to satisfy Article III standing, Aetna respectfully requests leave to amend.  A party should be freely given leave to amend "when justice so requires."  Fed. R. Civ. P. 15(a)(2).  The court should only deny an amendment where the plaintiff has demonstrated undue delay, bad faith, or dilatory motives, or where the amendment would be futile or would prejudice the defendant.  *Synthes, Inc. v.*

---

[4] As this Court has already found as to Dent and Johnson, Mallory, of course, can be liable as a "corporate officer" of HDL under the participation theory.  *Aetna, Inc.*, 2015 U.S. Dist. LEXIS 172003, at *24-25 (citations omitted).  *See Wicks v. Milzoco Builders, Inc.*, 470 A.2d 86, 90 (Pa. 1983) ("The general, if not universal, rule is that an officer of a corporation who takes part in the commission of a tort by the corporation is personally liable therefor.") (citation and quotation omitted); (Dkt. No. 26, Aetna's Memo of Law at 24-26.)

*Marotta*, 281 F.R.D. 217, 224 (E.D. Pa. 2012) (quoting *Lake v. Arnold*, 232 F.3d 360, 373 (3d Cir. 2000)).

None of the elements which would counsel against granting leave to amend are present in this case.  In particular, Mallory complains about purported conclusory allegations directed to her in the Amended Complaint.  While Aetna maintains that its claims are adequately pleaded under the Federal Rules and Article III, § 2 of the United States Constitution, to the extent that the Court may require Aetna to plead additional facts, Aetna would be able to provide those in an amended pleading.  Such an amendment would not be futile.  To the contrary, allowing Aetna to proceed on the merits of its claims, rather than dismiss those claims for failure to plead standing with requisite specificity, is unquestionably in the interests of justice.  Indeed, additional facts arising from the federal investigation continue to become public, and paint an even more dire picture of Defendants' kickback and billing scheme.

## V.   <u>CONCLUSION</u>

For the foregoing reasons, Aetna has clearly demonstrated that the Amended Complaint satisfies the threshold requirements set forth by Article III of the Constitution by alleging an actual case-or-controversy.  Accordingly, this Court should deny Defendant Mallory's Motion. Alternatively, and to the extent that the Court dismisses any of Aetna's claims, Aetna respectfully requests leave to amend its claims against Mallory.

Respectfully submitted,

*/s/ John M. Elliott*
John M. Elliott
James C. Crumlish, III
Mark J. Schwemler
Date:  September 15, 2016            John P. Elliott
Gregory S. Voshell

ELLIOTT GREENLEAF, P.C.
925 Harvest Drive, Suite 300
Blue Bell, PA 19422
215-977-1000

*Counsel for Plaintiff Aetna Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I, John M. Elliott, Esquire, hereby certify that I caused the foregoing to be filed electronically with the Court, where it is available for viewing and downloading from the Court's ECF system, and that such electronic filing automatically generates a Notice of Electronic Filing constituting service of the filed document upon all counsel of record.

<u>*/s/ John M. Elliott*</u>
John M. Elliott

Date:  September 15, 2016