IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| AETNA, INC., | : | CIVIL ACTION |
| Plaintiff, | : | |
| v. | : | No. 15-1868 |
| HEALTH DIAGNOSTIC LABORATORY INC., BLUEWAVE HEALTHCARE CONSULTANTS, INC., FLOYD CALHOUN DENT, III, ROBERT BRADFORD JOHNSON, AND LATONYA MALLORY, | : | |
| Defendants. | : | |

## MEMORANDUM

**ROBERT F. KELLY, Sr. J.**                                              **OCTOBER 17, 2016**

Presently before the Court is Defendant, Latonya Mallory's ("Mallory") Motion to Dismiss Plaintiff's Amended Complaint and Memorandum of Law in Support thereof pursuant to Federal Rule of Civil Procedure 12(b)(1) and Plaintiff, Aetna Inc.'s ("Plaintiff" or "Aetna") Response in Opposition thereto. For the reasons set forth below, Mallory's Motion is denied.

### I.     BACKGROUND

This case involves an alleged fraudulent billing scheme that included paying illegal kickbacks to physicians, encouraging physicians to order unnecessary blood tests, and providing unlawful inducements to patients in the form of waived patient co-pays, co-insurance, and deductibles. (See Am. Compl. ¶ 1.) Aetna filed a Complaint on April 10, 2015, against Health Diagnostic Laboratory, Inc. ("HDL"), Bluewave Healthcare Consultants, Inc. ("Bluewave"), Bluewave's owners, Floyd Calhoun Dent, III ("Dent"), and Robert Bradford Johnson ("Johnson"), and Mallory, the CEO of HDL (collectively "Defendants"). (See Compl.)

Bluewave, Dent, and Johnson filed a Motion to Dismiss the Complaint against Bluewave on July 10, 2015, and Aetna subsequently filed its First Amended Complaint on August 31, 2015. Bluewave, Dent, and Johnson then filed a Motion to Dismiss the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) on October 19, 2015, which was denied on December 28, 2015.  (Doc. No. 30.)  Presently before this Court is Mallory's Motion to Dismiss the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction and standing under Article III of the Constitution.  (Doc. No. 38.)

Aetna provides health insurance and administrative services for benefits plans to clients throughout the country.  (See Am. Compl. ¶ 10.)  A network of medical providers agrees to provide the health care benefits for Aetna members at a negotiated rate.  (Id. ¶ 25.)  These medical providers have an obligation to refer patients to other in-network providers or facilities, where possible, to help Aetna control costs.  (Id. ¶ 28.)  Members do have the option to receive out-of-network benefits provided that they are liable for increased co-payments due to Aetna not having a contracted rate with the provider.  (Id. ¶¶ 29-30.)

HDL was a clinical laboratory that performed diagnostic tests on patient's blood samples, which were sent to it from referring physicians.  (Id. ¶¶ 3, 11.)  HDL announced on April 9, 2015, that it was paying at least $47 million to federal authorities to resolve allegations of violations of the False Claims Act, 31 U.S.C.A. § 3730, which Aetna alleges involves the same types of overbilling schemes that are alleged in this case.  (See id. ¶ 3; Ex. A.)  HDL recently filed for protection under the federal bankruptcy laws, and a stay of proceedings against it is in effect.  (Id. ¶ 4.)

According to Aetna, Bluewave directly contacted numerous referring physicians throughout the nation, informing them that they would receive a payment to refer blood samples

to HDL for analysis.  (Id. ¶ 35.)  This payment to the physicians is alleged to have been at least $20 dollars for each referral to HDL, which is more than six times the rate permissible by Medicare.  (Id. ¶ 41.)  Aetna avers that Bluewave entered into a sales agreement with HDL to receive a commission from the revenue collected by HDL from sales generated by Bluewave.  (Id. ¶¶ 18, 20; Ex. B.)  This sales agreement was executed by Mallory as CEO of HDL.  (Id. ¶ 18.)  Aetna alleges that in the sales agreement with HDL, Bluewave "agreed to actively market and promote practices which involved paying kickbacks to physicians, offering unlawful inducements to patients and physicians, encouraging physicians to order unnecessary panels of blood tests, and other unlawful practices."  (Id. ¶ 18; Ex. B.)

Due to the increased cost of using HDL services because of its status as "out-of-network," Aetna alleges that HDL would waive these large out of pocket expenses for Aetna members to induce the members to use HDL's services.  (Id. ¶ 50.)  Aetna avers that Mallory and HDL failed to disclose to Aetna both the kickback scheme and the fact they were discounting Aetna's members' billing.  (Id. ¶¶ 43, 54.)  Due to these non-disclosures, Aetna paid more than it should have been required to pay because HDL was essentially giving a discount to Aetna members, and the payments made from Aetna to HDL were made based on a percentage of the billed charges.  (Id. ¶¶ 54-55.)

Aetna's Amended Compliant avers that the fraudulent scheme implemented by Defendants resulted in fraud (Count I), tortious interference with business and contractual relations (Count II), civil conspiracy (Count III), and unjust enrichment (Count IV).[1]  (Id. ¶¶ 64-88.)

---

[1] Pennsylvania law applies because federal courts sitting in diversity cases must apply the substantive law of the states where they sit.  See Erie Railroad Co. v. Tompkins, 304 U.S. 64 (1938).

## II.     STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 12(b)(1), a court must grant a motion to dismiss if it lacks subject-matter jurisdiction to hear a claim. In re Schering Plough Corp., 678 F.3d 235, 243 (3d Cir. 2012). "A motion to dismiss for want of standing is . . . properly brought pursuant to Rule 12(b)(1), because standing is a jurisdictional matter." Ballentine v. United States, 486 F.3d 806, 810 (3d Cir. 2007). Pursuant to Federal Rule of Civil Procedure 12(b)(1), when "considering a motion to dismiss for lack of subject matter jurisdiction, the person asserting jurisdiction bears the burden of showing that the case is properly before the court at all stages of the litigation." Fed. Realty Inv. Tr. v. Juniper Props. Grp., No. 99-3389, 2000 WL 45996, at *3 (E.D. Pa. Jan. 21, 2000) (citing Packard v. Provident Nat'l Bank, 994 F.2d 1039, 1045 (3d Cir. 1993)). A defendant may contest subject matter jurisdiction by attacking the face of the complaint (i.e., a facial attack) or by attacking "the existence of subject matter jurisdiction in fact, quite apart from any pleadings" (i.e., a factual attack). Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977).

A facial challenge to subject-matter jurisdiction "considers a claim on its face and asserts that it is insufficient to invoke the subject-matter jurisdiction of the court because, for example, it does not present a question of federal law." Constitution Party of Pa. v. Aichele, 757 F.3d 347, 358 (3d Cir. 2014). In contrast, a factual challenge "is an argument that there is no subject matter jurisdiction because the facts of the case . . . do not support the asserted jurisdiction." Id. In other words, a facial attack "contests the sufficiency of the pleadings," Schering Plough, 678 F.3d at 243, "whereas a factual attack concerns the actual failure of a [plaintiff's] claims to comport [factually] with the jurisdictional prerequisites." CNA v. United States, 535 F.3d 132, 139 (3d Cir. 2008).

4

Mallory's Rule 12(b)(1) motion is properly understood as a factual attack because it contends that the Amended Complaints lack sufficient factual allegations to establish standing. "In evaluating whether a complaint adequately pleads the elements of standing, courts apply the standard of reviewing a complaint pursuant to a Rule 12(b)(6) motion to dismiss for failure to state a claim: 'Court[s] must accept as true all material allegations set forth in the complaint, and must construe those facts in favor of the nonmoving party.'" Schering Plough, 678 F.3d at 243 (citing Ballentine, 486 F.3d at 810) (citations omitted). "A complaint has to 'show' such an entitlement with its facts." Fowler v. UPMC Shadyside, 578 F.3d 203, 211 (3d Cir. 2009). "With respect to 12(b)(1) motions in particular, '[t]he plaintiff must assert facts that affirmatively and plausibly suggest that the pleader has the right he claims (here, the right to jurisdiction), rather than facts that are merely consistent with such a right.'" Schering Plough, 678 F.3d at 244 (citing Stalley v. Catholic Health Initiatives, 509 F.3d 517, 521 (8th Cir. 2007)).

"Article III of the Constitution limits the judicial power of the United States to the resolution of Cases and Controversies, and Article III standing enforces the Constitution's case-or-controversy requirement." Hein v. Freedom From Religion Found., Inc., 551 U.S. 587, 597–98 (2007). "One of the controlling elements in the definition of a case or controversy under Article III is standing." Id. at 598 (internal quotation marks and alterations omitted). The elements necessary for establishing standing under Article III are as follows:

> First, the plaintiff must have suffered an injury in fact-an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of-the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

5

Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61 (1992) (internal quotation marks, citations, and alterations omitted).

The burden to establish standing is less onerous at the motion to dismiss stage than it is at motion for summary judgment stage, as the United States Supreme Court ("Supreme Court") explains:

> At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.' In response to a summary judgment motion, however, the plaintiff can no longer rest on such 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts,' Fed. Rule Civ. Proc. 56(e), which for purposes of the summary judgment motion will be taken to be true. And at the final stage, those facts (if controverted) must be 'supported adequately by the evidence adduced at trial.'

Blunt v. Lower Merion Sch. Dist., 767 F.3d 247, 279 (3d Cir. 2014) (quoting Lujan, 504 U.S. at 561) (internal citations omitted).

## III.  DISCUSSION

As an initial matter, we agree with Mallory that we need not address standing for each individual claim, as is typically required. See DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 352 (2006) (holding that "a plaintiff must demonstrate standing for each claim he seeks to press"). A claim-by-claim discussion is unnecessary in situations, like this one, where all of the claims challenge the same conduct (i.e., the fraudulent, unlawful, and tortious billing scheme), and allege precisely the same injuries to Aetna (i.e., Aetna being forced to pay higher bills than it should have been required to pay). See Toll Bros., Inc. v. Twp. of Readington, 555 F.3d 131, 138 n.5 (3d Cir. 2009).

### A. Injury-in-Fact

Aetna has sufficiently alleged an injury-in-fact. The United States Court of Appeals for the Third Circuit ("Third Circuit") has held that the "[i]njury-in-fact element is not Mount Everest. The contours of the injury-in-fact requirement, while not precisely defined, are very generous, requiring only that claimant allege [ ] some specific, identifiable trifle of injury." Blunt, 767 F.3d at 278 (quoting Danvers Motor Co. v. Ford Motor Co., 432 F.3d 286, 294 (3d Cir. 2005)). Essentially, "the injury must affect the plaintiff in a personal and individual way." Lujan, 504 U.S. at 561 n.1. The Third Circuit has also noted that "[m]onetary harm is a classic form of injury-in-fact . . . . [and] it is often assumed without discussion." Danvers, 432 F.3d at 293 (internal citations omitted).

Mallory argues that the alleged injuries suffered to Aetna are vague and conclusory as it failed to allege any specific individualized harmed caused to it; therefore, they are wholly insufficient to meet the requirements of Article III. (Def. Mallory's Mem of Law at 3-4.) This is simply not the case. Aetna alleges that it had to pay higher bills than it should have been required to pay as a result of Defendants' scheme of paying illegal kickbacks and waiving members' payment obligations without disclosing that information to Aetna. (Am. Compl. ¶¶ 54-55, 59.) There is "no doubt" that monetary harm is sufficient to count as injury-in-fact. See Danvers, 432 F.3d at 293. Mallory appears to simply ignore these assertions made by Aetna.

Mallory's reliance on Schering Plough is misplaced. 678 F.3d 235. In Schering Plough, a pharmaceutical firm was accused of directly marketing its products for off-label use. Id. at 241-42. Third party payors ("TTPs") and individual patient consumers brought putative class action claims, pursuant to federal and state Racketeer Influenced and Corrupt Organizations

7

("RICO") laws, and other state laws against the pharmaceutical firm.  <u>See</u> <u>id.</u>  The Court's review was limited as many TTPs did not file an appeal.  <u>See</u> <u>id.</u> at 246 n.3.

One group of TTPs alleged three distinct injuries in their appeal: (1) they paid for off-label prescriptions that were ineffective; (2) they paid for off-label prescriptions when less expensive, but equally effective medication was available; and (3) they paid for elevated drug prices that recouped the costs of the defendant's illegal marketing.  <u>Id.</u> at 246.  However, because the argument section of the TPP's brief was limited to economic loss based on paying for ineffective drugs, the Third Circuit limited its own analysis to whether the complaint alleged a causal link between the challenged conduct and the injury actually argued on appeal.  <u>Id.</u> at 246–47.  The Court held that the TPPs failed to show an injury-in-fact for two of the prescriptions in their complaint because they did not allege that they ever personally paid for those particular prescriptions.  <u>Id.</u> at 247.  The Court held that the TTPs could not rely on the fact that other third party plaintiffs paid for the prescriptions in order to show injury-in-fact for their own claim.  <u>Id.</u>

These facts are easily distinguishable from the ones before us today.  Here, Aetna is not alleging that some other company or person suffered the harm as a result of Mallory's actions.  Rather, Aetna is alleging that it was harmed when it was forced to pay more than it should have due to Defendants' alleged fraudulent activity.  (<u>See</u> Am. Compl. ¶¶ 54-55.)  Therefore, unlike the TPPs in <u>Schering Plough</u>, Aetna has not alleged that the harm was suffered to anyone else but itself.  Therefore, Aetna has sufficiently alleged injury-in-fact to satisfy the Article III standards.

**B.  Fairly Traceable to the Challenged Action of the Defendant**

Mallory argues that, even if Aetna could establish injury-in-fact, it has failed to establish causation.  (Def. Mallory's Mem of Law at 6.)  We do not agree.  A court may "act only to redress injury that fairly can be traced to the challenged action of the defendant, and not injury

that results from the independent action of some third party not before the court." Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 41–42 (1976). "This causal connection need not be as close as the proximate causation needed to succeed on the merits of a tort claim." Toll Bros., 555 F.3d at 142 (citing Pub. Interest Research Group of N.J., Inc. v. Powell Duffryn Terminals Inc., 913 F.2d 64, 72 (3d Cir.1990)); see also Bennett v. Spear, 520 U.S. 154, 168–69 (1997) (cautioning against equating causation from standing with proximate causation from tort law). "Rather, an indirect causal relationship will suffice . . . so long as there is a fairly traceable connection between the alleged injury in fact and the alleged conduct of the defendant." Id. (internal quotation marks and citations omitted).

Aetna makes numerous allegations in its Amended Complaint regarding Mallory's involvement in the alleged fraudulent scheme including:

- "As set forth below, the illegal conduct engaged in by HDL and Bluewave was personally planned, authorized, directed and engaged in by **Mallory** when she was acting as the CEO, and by Dent and Johnson, who own and control Bluewave. The individual Defendants are believed to have derived tens of millions of dollars in profits via their illegal business practices." (Am. Compl. ¶ 2.)
- "Throughout the timeframe relevant to this case, Defendants Dent, Johnson, and **Mallory** used Bluewave to provide sales and marketing support to HDL, to enable, support and promote the unlawful billing and marketing schemes described herein." (Id. ¶ 5.)
- "While she operated HDL, Aetna believes that **Mallory** was paid many millions of dollars in compensation and other benefits as a result of the illegal marketing and business practices engaged in by all Defendants. In fact, Aetna believes that Mallory's participation in this scheme caused her to be paid, just between 2008 and 2014, over $26,000,000 in salary, bonuses and other compensation." (Id. ¶ 14.)
- "Effective January 2010, HDL and Bluewave entered into a 'Sales Agreement' executed by **Mallory**, Dent and Johnson . . . . Pursuant to this arrangement, Bluewave agreed to actively market and promote practices which involved paying kickbacks to physicians, offering unlawful inducements to patients and physicians, encouraging physicians to order unnecessary panels of blood tests, and other unlawful practices." (Id. ¶ 18.)

- "**Mallory**, Johnson and Dent, through Bluewave, agreed to develop a network of independent sales and marketing personnel who would promote HDL's improper business practices throughout the country." (Id. ¶ 19.)
- "The routine waivers of patient copayments and coinsurance effectively afforded a discount to Aetna members from the amounts that the Aetna members would normally be billed.  At the express direction of and with the support of Defendants Bluewave, Dent, Johnson and **Mallory**, however, HDL submitted billed charges to Aetna for blood testing performed for Aetna members, without disclosing to Aetna the bill had already been discounted to the patient.  The billed charges submitted to Aetna should have been reduced by the amount of the considerable co-payments and coinsurance amounts that had been waived, but the billed charges never accounted for those discounts." (Id. ¶ 54.)

We agree with Aetna that the Amended Complaint alleges that Mallory "directly enabled, supported, promoted, and profited from HDL's unlawful billing scheme." (Pl.'s Mem of Law at 12.)  Again, Mallory's reliance on Schering Plough is misplaced.  In Schering Plough, after the Court dismissed the allegations regarding two prescriptions due to the fact that the TPPs failed to allege that they personally paid for them, the Court analyzed whether the TPPs alleged a causal connection between the challenged conduct and the injury-payments for the prescription that was ineffective or unsafe for the use for which it was prescribed - regarding the prescriptions they actually purchased, i.e., Rebetol.  678 F.3d at 247.  The TPPs argued that the allegations regarding false marketing and illegal inducement about the other drugs in the complaint, paired with the fact that defendant alone marketed Rebetol, reasonably supported the inference that "discovery will almost certainly confirm" that the defendant also made "false statements about all the drugs described in the Complaint."  Id.  The Court held that "[i]t is pure conjecture to conclude that because [defendant]'s misconduct caused other doctors to write prescriptions for ineffective off-label uses for other products, [TPPs] ended up paying for two prescriptions for Rebetol due to the same kind of misconduct."  Id.

Here, Aetna's allegations are not pure conjecture and are distinguishable from those in Schering Plough.  Aetna has alleged that Mallory directly enabled, supported, promoted, and

profited from HDL's unlawful billing scheme. (Am. Compl. ¶¶ 2, 5, 14, 18, 19, 54.) Aetna attached the sales agreement between HDL and Bluewave in which "Bluewave agreed to actively market and promote practices which involved paying kickbacks to physicians, offering unlawful inducements to patients and physicians, encouraging physicians to order unnecessary panels of blood tests, and other unlawful practices." (Id. ¶ 18.) Mallory executed this agreement as CEO of HDL. (Id.) Furthermore, Aetna alleged that Mallory waived copayments and coinsurance without disclosing that information to Aetna. (Id. ¶ 54.) Thus, our case does not include any of the guesswork that was involved in the Schering Plough case. Rather, Aetna's alleged injury of having to pay higher bills than it should have paid can be easily traced to the alleged conduct of Mallory who allegedly enabled, executed, and profited from the unlawful kickback and billing scheme that led to these injuries. Unlike Schering Plough, Aetna is not arguing Mallory has implemented schemes like this before so discovery will surely uncover that she did it again. Here, Aetna has not only alleged the exact scheme, but also evidenced it by a sales agreement executed by Mallory. (See Am. Compl. Ex. A.) Therefore, we find that Aetna has satisfied the causation prong in our standing inquiry as its injury can be fairly traced to the challenged action of Mallory.

### C. Redressability

The final element of Constitutional standing is redressability. "This requirement is 'closely related to traceability, and the two prongs often overlap.'" Toll Bros., 555 F.3d at 142 (citing Powell Duffryn, 913 F.2d at 73)) (internal quotation marks omitted). "The difference is that while traceability looks backward (did the defendants cause the harm?), redressability looks forward (will a favorable decision alleviate the harm?)." Id. (citing Lujan, 504 U.S. at 560–61). The redressability prong thus requires a showing that "the injury will be redressed by a favorable

decision." Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc., 528 U.S. 167, 181 (2000). It requires that "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Id.

Mallory did not address redressability in her argument. We find no reason why Aetna's monetary injuries could not be redressed with a favorable decision. See United States ex rel. Krahling v. Merck & Co., 44 F. Supp. 3d 581, 602 (E.D. Pa. 2014) (finding redressability prong satisfied since the plaintiff sought compensatory damages and other statutory damages and, if they were awarded, they would likely provide redress for the plaintiff's economic injuries).

### IV.   CONCLUSION

In accordance with the above, we deny Mallory's Motion to Dismiss the Amended Compliant.

An appropriate Order follows.